# Exhibit A

FIFTH THIRD BANK

38 Fountain Square Plaza
Cincinnati, Ohio 45263

# Master Treasury Management Agreement

This Master Treasury Management Agreement ("*Agreement*") is by and between the undersigned "*Customer*" and Fifth Third Bank, N. A. ("*Bank*") and is effective as of the date executed by Bank as indicated on the Signature Page to this Agreement (the "*Effective Date*"). Unless otherwise defined herein, capitalized terms shall have the meaning provided in Section 26 of this Agreement below.

June 2021

## SECTION 1. BANK SERVICES

***Section 1.1. Service Terms.*** Customer desires to obtain and Bank agrees to provide the Services as set forth in this Agreement and more specifically described in the applicable Service Terms. The Commercial Account Rules apply to the use of an Account in connection with a Service, and together with this Agreement, govern the Services. In the event of a direct conflict between the Service Terms and this Agreement, the Service Terms will control. If there is a conflict between this Agreement and the Commercial Account Rules, the provisions of this Agreement prevail to the extent necessary to resolve the conflict. Any reference to this Agreement shall be deemed to include the applicable Service Terms, any Related Agreements and the Implementation Materials.

***Section 1.2. Customer Use.*** Customer may request a Service by any means Bank permits, provided that such Service will not be available unless and until Bank approves and enables the Service for Customer. By using the Service, Customer acknowledges and agrees it has received a copy of the Service Terms for that Service, the Service Terms apply to Customer's use of the Service, and the Service Terms are incorporated into, and made a part of, this Agreement. Neither party is bound by or subject to the Service Terms for any Service Customer does not use. Bank provides the Services for the sole and exclusive benefit of Customer, and if Bank approves in writing, Customer's Affiliates.

***Section 1.3. Accounts.*** Customer shall at all times have and maintain with Bank one or more Accounts for use in connection with a Service and maintain in such Account sufficient Available Funds to pay for Customer's use of, and transactions in, such Accounts, including Fees and other expenses payable to Bank.

***Section 1.4. Use of Third Parties.*** (a) Any Vendor used by Customer is Customer's agent and not Bank's, and Customer is liable and solely responsible for: (i) any Vendor's use of the Services or failure to comply with this Agreement, including any Security Procedures or operating requirements relating to the Services; and (ii) all fees, costs and expenses owed to each Vendor for its services. (b) Customer acknowledges and agrees that Bank may arrange for certain or all aspects of the Services, including software and processing, to be performed or provided by a Processor and that Customer shall have no rights or remedies and agrees not to bring a claim or cause of action against any such Processor for the Services, but only against Bank. Bank's Processors are obligated to comply with the terms of this Agreement; provided, that, Bank is solely liable and responsible for the aspects of the Service provided by its Processors to the same extent as if Bank has performed or failed to perform the Service.

## SECTION 2. ONLINE CHANNEL ACCESS AGREEMENT

Customer is required to enter into and maintain an Online Channel Access Agreement in effect between Customer and Bank in order to use and access the Services (the "*OCAA*"). The OCAA in effect from time to time governs the Access Channels and Channel Services (each as defined in the OCAA) used to access the Services where applicable. The Channel Services available in connection with these Services include the ability to view and manage Account information, transmit Instructions, Payment Orders and other

directions and decisions to Bank, and other online features as described in this Agreement or the Service Terms. The Access Channels and Channel Services are each hereby deemed *"Services"* under this Agreement.

## SECTION 3. CUSTOMER INFORMATION

***Section 3.1. Service Information; Implementation.*** Customer agrees to provide all information that Bank reasonably requires in order to set up and provide the Services to Customer, including, but not limited to, completing the Implementation Materials. Customer (a) represents and warrants that all information provided or to be provided to Bank by Customer's representatives on the Implementation Materials or otherwise in connection with the Services is true and correct, and (b) agrees to provide any additional information that Bank may reasonably require to begin, or continue providing, the Services. Any changes made by Customer to the information provided to Bank must be made in writing and will be effective after Bank has had a reasonable opportunity to act on the changed information. Any addition, deletion or change to any Services or Service Terms requested by Customer (each, a "*Change Request*") is subject to Bank's approval and must be submitted with information required by, and in a form acceptable to, Bank. No Change Request will become operative or effective until Bank has had an opportunity to review and respond to such Change Request, which the Bank agrees to do within a reasonable period of time.

***Section 3.2. Personnel.*** Bank is entitled to rely upon the accuracy and authenticity of all Instructions, information and authorizations received from an officer or authorized employee or representative of Customer (an "*Authorized Agent*") and those purporting to be from an Authorized Agent. Customer agrees to notify Bank immediately of any change in the status of an Authorized Agent. Customer acknowledges that Bank may require a reasonable time period to implement any such change. Customer agrees that Bank may refuse to comply with requests from any individual until Bank receives documentation reasonably satisfactory to Bank confirming the individual's authority.

## SECTION 4. FEES AND TAXES

Customer agrees to pay Bank the fees and charges for Services as disclosed to Customer, including in any fee schedule, along with fees and charges for any requested or required special service or handling (collectively, the "*Fees*"), as they may be changed by Bank from time to time without amending this Agreement. Customer is responsible for all taxes attributable to its use of the Services or this Agreement (excluding taxes based on Bank employees, property or net income). Unless other arrangements are made for payment of the Fees, Bank will automatically debit an Account in the amount of such Fees when due.

## SECTION 5. INSTRUCTIONS

Each Instruction that is sent to Bank electronically in accordance with this Agreement including the applicable Service Terms shall be considered to be an original writing and to have been signed by an Authorized Agent. Customer is solely responsible for the accuracy and completeness of each Instruction or communication sent to Bank. Any Instruction or other communication Customer sends to Bank will not be effective until Bank actually receives it and has had a reasonable opportunity to act upon it.

## SECTION 6. BANK REPRESENTATIONS AND WARRANTIES

Bank represents and warrants to Customer that: (a) Bank is duly organized, validly existing, and in good standing in the jurisdiction in which Bank is organized; (b) the execution, delivery and performance by Bank of this Agreement has been authorized by all necessary corporate and governmental action; (c) the persons signing this Agreement on Bank's behalf are duly authorized to do so; (d) this Agreement represents Bank's legal, valid and binding obligation; and (e) Bank's execution and performance of this Agreement and Bank's provision of the Services do not and will not violate any Applicable Law, Bank's articles of association or bylaws or any material agreement applicable to the Services by which Bank is bound. EXCEPT AS EXPRESSLY SET FORTH ELSEWHERE IN THIS AGREEMENT OR IN THE APPLICABLE SERVICE TERMS, BANK MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, OF ANY KIND WITH RESPECT TO ANY SERVICE OR BANK'S PERFORMANCE OF THE SERVICES, INCLUDING, WITHOUT LIMITATION, THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NO DESCRIPTIONS OR SPECIFICATIONS CONSTITUTE REPRESENTATIONS OR WARRANTIES OF ANY KIND.

## SECTION 7. CUSTOMER REPRESENTATIONS AND WARRANTIES

Customer represents and warrants to Bank that: (a) Customer is duly organized, validly existing, and in good standing in the jurisdiction in which Customer is organized, and is validly qualified in any other jurisdiction where Customer does business and is required to be qualified except where the failure to be so qualified would not have a material adverse effect on Customer; (b) the execution, delivery and performance by Customer of this Agreement and the use of the Services have been authorized by all necessary entity and governmental action; (c) each person signing this Agreement on Customer's behalf is duly authorized to do so; (d) this Agreement represents Customer's legal, valid and binding obligation; (e) the execution and performance of this Agreement and the use of the Services do not and will not violate in any material respect any Applicable Law, Customer's entity governing documents, or any material agreement by which Customer is bound and Customer is an authorized participant in any payment network it uses in connection with the Services; (f) each Account that Customer maintains with Bank, and all use of the Services, is solely for a legitimate business or commercial purpose and not a personal, family or household purpose, and (g) the use of the Services does not and will not subject Bank, or Bank's Processors, to the privacy and security requirements of the Health Insurance Portability and Accountability Act, as a business associate (defined at 45 CFR 160.103) or otherwise, unless Customer has notified Bank of such requirements and the parties have entered into a business associate agreement in a form reasonably acceptable to Bank. Customer reaffirms these representations and warranties each time it uses a Service and agrees to promptly notify Bank if any representation or warranty made by Customer is no longer true.

## SECTION 8. SECURITY PROCEDURES; OPERATING PROCEDURES

***Section 8.1. Establishment.*** Customer will use the Services, Access Channels and Channel Services in accordance with the terms of the Agreement, including any Security Procedures offered by Bank in connection with the Services and as may be set forth in the applicable Implementation Materials. The Security Procedures verify the origin and authenticity of Instructions and communications sent to Bank, and are not designed to detect errors in any Instruction sent to Bank. Where permitted, Customer will select from the Security Procedures for a particular Service from those offered and recommended by Bank in the set-up process for that Service, and agrees to implement changes to the Security Procedures issued by

Bank as needed. Customer agrees that such Security Procedures selected by Customer are commercially reasonable and suitable for Customer with respect to Customer's intended use of the applicable Services, including the size, type, and frequency of Customer's Payment Orders. If Customer requests or chooses to communicate any Payment Order or other Instruction to Bank in a manner that varies from the Security Procedures, then Customer will be deemed to have refused the Security Procedures that Bank recommends as commercially reasonable and Customer agrees to be bound by such Payment Order or Instruction, whether or not authorized, when accepted by Bank in good faith.

***Section 8.2. Verification.*** Any Instructions and Payment Orders communicated to Bank in Customer's name in compliance with the Security Procedures, and all access to and use of Services and Channel Services using the Security Procedures assigned to Customer, are considered authorized by Customer, whether or not authorized, and Customer shall be bound by the same in accordance with Applicable Law and the terms of this Agreement. Bank has no obligation to accept an Instruction or Payment Order that is not communicated in compliance with the Security Procedures, and Bank shall not be responsible for refusal to act upon any Instruction or Payment Order received which does not comply with the Security Procedures.

***Section 8.3. Electronic Funds Transfers.*** In connection with the use of Bank's wire transfer, ACH, SWIFT, Real Time Payments and other electronic funds transfer Services (whether or not through or with any clearinghouse or third party), Bank recommends that Customer establish an approval protocol appropriate for Customer's particular circumstances (including the size, type and frequency of such transactions) as part of the Security Procedures to prevent unauthorized transactions. If Customer does not establish and require adherence to an approval protocol for such funds transfers or if Customer selects a "*no approval*" option, Customer assumes the risks of all transactions that could have been prevented by requiring such protocol or approval. Funds transfers involving only internal electronic funds transfers between Accounts may not be subject to all of the Security Procedures required for external electronic funds transfers.

***Section 8.4. Credentials.*** Access to some Services may require the use of certain Credentials. Proper use of the Credentials is part of the Security Procedures for these Services. The use of the Credentials is subject to any terms of use or license accompanying the Credentials as applicable, and may only be used as and where delivered to Customer and only for the purpose of accessing Services. The Credentials and the related technology, documentation and materials at all times remain the Bank's or its Processor's property.

***Section 8.5. Authority.*** The Security Procedures are in addition to and do not limit, revoke or affect the authority of any person (whether by course of dealing or otherwise) to transmit Instructions in Customer's name. Bank may continue to rely upon such authority and Bank is authorized to act upon Instructions received from persons acting pursuant to such authority. Customer is bound by any authorized Payment Order or other Instruction, and by use of the Channel Services by authorized personnel.

***Section 8.6. Other Applications.*** (a) As part of the Security Procedures, Bank applies software and other programs and processes ("*Additional Programs*") to select certain Instructions for further review and verification by Customer. The application of these Additional Programs may delay the processing of Instructions or other transactions until Bank obtains such verification. Bank will use reasonable efforts to obtain such verification, provided; that Customer understands and agrees that Bank has no obligation to

use or comply with any such Additional Programs, and Customer agrees that these additional procedures are NOT a substitute for proper Account controls and management on its part. Bank is not responsible for its refusal to act upon or delay in processing any Instruction that does not comply with this Agreement or the applicable Service Terms, or as a result of properly following the Security Procedures or applying Additional Programs. (b) Notwithstanding the foregoing, Bank may in its sole discretion implement internal monitoring systems to evaluate Customer's transactions and the risk of potential fraudulent activity (*"Transaction Monitoring"*). Transaction Monitoring is part of Bank's internal processing and is not part of the Additional Programs or Security Procedures, and Customer agrees that the Security Procedures will be considered commercially reasonable regardless of whether they incorporate information from Transaction Monitoring or not. Bank reserves the right to reject Payment Orders and other Instructions verified by the Security Procedures in the event Bank identifies a risk of potential fraudulent activity and Bank shall not be liable for its refusal to act upon any Payment Order or other Instructions based upon the results of Transaction Monitoring.

***Section 8.7. Safeguarding the Security Procedures.*** Customer agrees to (a) maintain the complete security and confidentiality of the Security Procedures, and (b) institute and use prudent internal security procedures and practices to control access to and use of the Security Procedures. Customer's failure to protect the confidentiality of the Security Procedures may enable unauthorized access to the Services and to Customer's Accounts and data. Customer agrees to notify Bank immediately if there has been a breach of its security, or any Security Procedure has been lost, stolen, misused or compromised. In addition to Customer's obligations to safeguard the Security Procedures and establish procedures to ensure their confidentiality, Customer agrees to change the Credentials periodically and whenever: (x) anyone who has had access to the Credentials is no longer employed or authorized by Customer to use the Services; or (y) there is known or suspected unauthorized access to the Security Procedures.

***Section 8.8. Customer Systems.*** Customer is responsible for maintaining the security and reliability of the hardware, software and all other aspects of the information technology infrastructure and systems used by Customer to access or use the Services, Accounts and Account information, and for any malfunction, security breach, virus, inaccuracy or other failure of any of its information technology infrastructure.

## SECTION 9. COMPLIANCE

This Agreement and the use and provision of Services are subject to all Applicable Law, including without limitation, the UCC and Operating Rules. Both parties agree to be bound by the Operating Rules where applicable and to comply with Applicable Law in using or providing the Services, as the case may be.

## SECTION 10. LIMITATION OF LIABILITY

CUSTOMER AGREES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THAT IN ADDITION TO ANY OTHER LIMITATION ON BANK'S LIABILITY IN THIS AGREEMENT OR THE OCAA, IN NO EVENT WILL BANK (OR ITS OFFICERS, DIRECTORS, SHAREHOLDERS, AFFILIATES, EMPLOYEES OR AGENTS) BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR SPECULATIVE LOSSES, EXPENSES, INJURY, COSTS OR DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, REVENUE, SAVINGS, TIME, DATA, GOODWILL AND OPPORTUNITIES, ATTORNEYS' FEES, AND COURT AND OTHER DISPUTE RESOLUTION COSTS)

THAT CUSTOMER OR ANY OTHER PERSON MAY INCUR OR SUFFER IN CONNECTION WITH THIS AGREEMENT, EVEN IF BANK HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS, COST OR DAMAGE AND REGARDLESS OF THE TYPE OF CLAIM.

Bank's liability to Customer arising from any Service or this Agreement will be limited to Customer's actual monetary damages that are the direct result of Bank's negligence or willful misconduct. Notwithstanding the foregoing, for Payment Orders which are governed by and subject to UCC Article 4A, Bank is liable only for interest losses attributable to Bank's failure to exercise ordinary care resulting in the failure, delay, or improper execution of any Payment Order as required by UCC Article 4A. In addition to the foregoing limitation, in the instance of any overbilling by Bank that is timely reported by Customer as required by this Agreement, Bank's liability shall not exceed the amount overbilled by and paid to Bank by Customer. In no instance shall Bank be responsible or liable for any (a) act or omission of Customer's officers, employees or agents, or of any other third party (other than Bank's Processors), (b) failure to act by Bank if Bank reasonably believed taking the omitted action would have violated Applicable Law, or (c) interception of information relating to the Customer or its transactions as a result of Customer's use of the Internet or other Access Channel or the Channel Services that is not the result of Bank's gross negligence or willful misconduct.

## SECTION 11. INDEMNIFICATION OBLIGATIONS

***Section 11.1. Customer.*** To the fullest extent not prohibited by Applicable Law, Customer agrees to indemnify and hold Bank and its officers, directors, employees, affiliates, shareholders and agents harmless from and against any and all Losses resulting directly or indirectly from, or arising in connection with: (a) Customer's breach of any of Customer's agreements, representations, warranties or covenants in this Agreement, the Service Terms or any other Related Agreement; (b) Customer's violation of Applicable Law; or (c) Customer's use of the Services and Bank complying with or carrying out any Instruction or other direction given to Bank in accordance with this Agreement. Customer is not, however, obligated to indemnify Bank for any Losses directly resulting from Bank's gross negligence, willful misconduct, or bad faith.

***Section 11.2. Bank.*** To the fullest extent not prohibited by Applicable Law, Bank agrees to indemnify and defend at Bank's own expense or settle any action brought against Customer to the extent that it is based on a claim that Customer's use of a Service directly infringes a copyright, trademark or patent or constitutes misappropriation of a third-party trade secret, provided, however, that Customer: (a) promptly notifies Bank in writing of such claim; (b) has not made any admission of liability or agreed to any settlement or other material issue relating to such claim; (c) reasonably cooperates with Bank at Bank's expense in the defense or settlement; and (d) gives Bank sole control and authority over all aspects of the defense or settlement of such claim.

## SECTION 12. BANK RECORDS.

Bank's records as to this Agreement and Related Agreements, Services and transactions using the Services shall be controlling in the event of any conflict with Customer's records. Customer authorizes Bank (but Bank is not obligated) to record electronically and retain telephone conversations between Customer and Bank. Imaging and electronic records will be retained by Bank, and copies of such records will be available

at Customer's request and expense, until such records are disposed of in accordance with Bank's then current policies and procedures.

## SECTION 13. CONFIDENTIALITY, PRIVACY AND SECURITY

***Section 13.1. Customer.*** Subject to Customer's duties under Applicable Law, Customer agrees to keep confidential and not disclose to any third party (other than its agents) Bank's Fees, Service Terms, software, non-public Service features and other proprietary information and systems Bank and its Processors provide and disclose in connection with the Services. Customer acknowledges the exclusive ownership by Bank or its Processors of such information, and agrees to use such information solely for purposes of using the Services.

***Section 13.2. Bank.*** Bank acknowledges that non-public information Bank obtains from Customer in connection with providing a Service to Customer may be confidential. Bank has implemented policies, procedures, and controls to safeguard Customer information in accordance with Applicable Law and regulatory guidelines.

## SECTION 14. ACCOUNT MANAGEMENT

***Section 14.1. Customer Information Review.*** Customer is responsible for monitoring its use of the Services and all activity in its Accounts with Bank. Information regarding transactions with the Services is reported on Customer's periodic Account statement and is available through the Channel Services. Depending upon the Services that Customer uses, Customer will have access to Account and transaction information on a prior day, intraday and/or real time basis. Account and transaction information changes frequently and is subject to updating, verification and correction. Bank assumes no responsibility for Customer's reliance on any Account or Service information reported on an intraday or prior day basis that is subsequently updated, verified or corrected. Customer understands and agrees to: (a) regularly review the Account and transaction information (including statements) that Bank makes available to Customer; and (b) notify Bank as soon as reasonably possible of any error, unauthorized transaction, discrepancy or other similar matter (each, an *"Error"*).

***Section 14.2. Error Reporting***. Customer understands that the nature of certain transactions and Applicable Law relating to certain Services require that Customer provide Timely Notice (defined below) of an Error in order to preserve or exercise rights against third parties that may have been the beneficiary of such Error. *"Timely Notice"* is defined as notice provided to Bank: (a) on the same Business Day with respect to any Payment Order (including Real Time Payments), (b) the next Business Day for other electronic funds transfers, or (c) within thirty (30) days for any other Instruction, transaction or Service (ninety (90) days in the case of Fees), following the date on which such information is sent by Bank or otherwise made available to Customer. If Customer fails to provide Timely Notice to Bank of any Error, then Customer shall be precluded from asserting such Error against Bank. The Timely Notice requirement does not limit Bank's or Customer's rights to attempt to collect on unauthorized or fraudulent transactions from other banks. Notwithstanding the forgoing, Bank reserves the right, in its sole discretion, to adjust transaction records for good cause after the expiration of the Timely Notice time periods.

***Section 14.3. Loss Prevention.*** Customer agrees to institute, maintain and enforce Customer Measures. In addition to the Customer Measures, Bank offers a variety of Services and other tools designed

to assist Customer in reducing or stopping the incidence of fraud and unauthorized activity in Customer's Accounts, including enhanced reporting Services, Notifications, positive pay, ACH transaction control, disbursement control, information reporting and Account management Services and features. To the extent Customer chooses not to use one of these Services or tools or implement Customer Measures, and the proper use of that Service, tool or Customer Measure could reasonably have prevented a Loss due to an incidence of fraud or unauthorized activity suffered or incurred by Customer (an "*Incident*"), Customer will be deemed to have assumed the risk of such Incident, shall hold the Bank harmless for the amount of such Loss, and will be precluded from asserting that Bank is responsible for such Incident.

## SECTION 15. OVERDRAFTS

Bank may delay or refuse to process any item, transaction or Instruction that would result in an Overdraft (as defined in the Commercial Account Rules) in Customer's Account. Bank processes items and other debits to Customer's Account in the order described in the Commercial Account Rules. If Bank decides in its discretion to process an item, transaction or Instruction despite the Overdraft, Customer agrees to reimburse Bank immediately for: (a) the full amount of any Overdraft or shortfall created by that item, transaction or Instruction; (b) all Overdraft Fees; (c) interest on the amount of the Overdraft or shortfall for the day the Overdraft or shortfall was created and for each following day until the Overdraft or shortfall has been paid; and (d) all Losses Bank incurs in collecting the Overdraft from Customer.

## SECTION 16. TRANSACTION LIMITS

Bank has the right to limit Customer's transaction volume or dollar amounts, suspend any or all Services and refuse to execute transactions, or terminate any or all Services if Bank in good faith determines that: (a) providing any Service to Customer could reasonably be expected to result in a violation of any Applicable Law or a material loss to Bank, (b) Bank is entitled to terminate the applicable Service pursuant to Section 19 of this Agreement (with or without the lapse of time or notice), or (c) Customer is in default under this Agreement or any Related Agreement. In addition, Bank may limit the types of Instructions Customer may send to Bank for processing or execution. To the extent not restricted by Applicable Law, Bank will promptly communicate decisions regarding such limitations to Customer. Bank reserves the right to limit transaction volume or dollar amounts in any other circumstances, provided Bank gives Customer prior notice of any material limitation or decrease in previously communicated limitations. Customer agrees to provide Bank, upon its request from time to time, with such financial information and statements and other documentation as Bank reasonably determines to be necessary or appropriate to enable Bank to evaluate its exposure or risk.

## SECTION 17. BANK RIGHT OF SETOFF; SECURITY INTEREST

Bank has the right to obtain payment of any unpaid amount owed to Bank under this Agreement or any Related Agreement by setting off and debiting any of Customer's Accounts or accounts with Bank or any of Bank's affiliates at any time (excluding any Account expressly titled to clearly demonstrate that the Account is held by Customer in a fiduciary or representative capacity for a third party such as, for example, a custodial Account) for the amount owed. Bank's rights are limited to the extent of limitations and restrictions imposed by Applicable Law. Customer grants to Bank a security interest in all Accounts held by Customer now or in the future with Bank or any of Bank's affiliates to secure payment of any and all obligations under the

Agreement; provided that this security interest shall be subordinate to any security interest separately agreed to in writing by Bank.

## SECTION 18. FORCE MAJEURE

Neither party shall be responsible, and neither shall incur any liability to the other, for any failure, error, malfunction or any delay in carrying out any of its obligations under this Agreement directly resulting from causes beyond such party's reasonable control, including without limitation, fire, casualty, lockout, strike, pandemic, epidemic, or disease outbreak, legally mandated quarantine or travel or work restrictions, unavoidable accident, failure of networks, the Internet or telecommunications systems, act of God, act of terrorism, riot, war or the enactment, issuance or operation of any adverse governmental law, ruling, regulation, order or decree, or an emergency that prevents such party from operating normally; provided, however, that Customer shall not be relieved of its responsibility for timely performance of any of its payment obligations to Bank.

## SECTION 19. TERM AND TERMINATION

***Section 19.1. Term.*** This Agreement shall remain in full force and effect until terminated by either party as provided in this Agreement. Either party may terminate this Agreement or any Service at any time by giving thirty (30) days' prior written notice of termination to the other party.

***Section 19.2. Bank.*** Bank may terminate this Agreement or terminate or suspend any Service immediately upon notice to Customer if: (a) Customer breaches a material obligation under this Agreement or Related Agreement or violates any Applicable Law or the Operating Rules in connection with the Services or any Related Agreement; (b) Customer becomes insolvent, is placed in receivership or is adjudicated bankrupt or Customer becomes subject to any voluntary or involuntary bankruptcy proceeding or any assignment for the benefit of its creditors; (c) Customer's financial condition has become materially impaired in Bank's good faith opinion such that Customer is unlikely to be able to perform its material obligations to Bank; (d) any person or group acting in concert that is not a controlling stockholder of Customer on the date of this Agreement acquires, directly or indirectly (whether by merger, stock purchase or issuance, recapitalization, reorganization or otherwise), a majority of Customer's outstanding equity interests; or (e) the continued provision of Services in accordance with the terms of this Agreement would, in Bank's good faith opinion, violate Applicable Law or any requirement of any regulatory authority or subject Bank to an unacceptable risk of loss or material security risk.

***Section 19.3. Effect.*** Upon any termination of this Agreement, Customer shall: (a) promptly pay to Bank all sums due or to become due under this Agreement; (b) securely destroy or immediately return (if required by the Service Terms) to Bank at Customer's expense, the Security Procedures (if applicable), and all related Implementation Materials, and all copies and reproductions thereof, whether written or in magnetic media and whether received from Bank or otherwise; and (c) have no further right to make use of the Services.

***Section 19.4. Survival.*** Termination of a Service or this Agreement does not relieve or excuse Customer's payment obligations for any Services that Bank provides to Customer before or after the Service or this Agreement is terminated, nor does it release Customer or Bank from any of Bank's respective obligations that arose or became effective prior to such termination. In addition, all provisions of this

Agreement relating to the parties' warranties, representations, confidentiality or non-disclosure obligations, proprietary rights, limitation of liability, and indemnification shall survive the termination of a Service or this Agreement.

## SECTION 20. ENTIRE AGREEMENT

This Agreement, together with any Related Agreements constitutes the complete and exclusive statement of the agreement between the parties with respect to the Services and supersedes any prior or contemporaneous agreements between the parties with respect to such Services. Nothing in this Agreement confers a right or benefit on any person or entity other than Bank and Customer.

## SECTION 21. AMENDMENT

***Section 21.1. Generally.*** This Agreement, including the Service Terms, may be modified by a written agreement executed and signed by the parties. Bank may, however, modify this Agreement, including the Service Terms, by giving Customer thirty (30) calendar days' prior written notice. If Customer continues to use any Service or the affected Service, as the case may be, after the expiration of the thirty-day period or a later effective date specified in such notice, Customer is bound by the Agreement or Service Terms as the case may be, as so modified.

***Section 21.2. Regulatory Changes, Security Measures.*** Notwithstanding the foregoing, (a) if a modification to this Agreement or the Service Terms is required by or under Applicable Law or by a regulatory authority with jurisdiction over Bank, or (b) if modifications to the Security Procedures are required in order to maintain the security and integrity of Customer's use of the services, but without an adverse material effect on Customer's use of the Services, then in either instance Bank may modify this Agreement, the applicable Service Terms or Security Procedures by giving Customer notice of the modification by any means permitted, and the modification will be effective immediately upon Bank giving such notice.

## SECTION 22. ASSIGNMENT

Customer may not sell, assign or transfer, or grant a security interest in any of its rights or obligations under this Agreement without Bank's prior written consent. Bank may assign its rights and obligations under this Agreement in whole or in part without Customer's consent (a) pursuant to, or in connection with any merger, consolidation or amalgamation involving Bank or its parent company, or the sale or transfer of all or substantially all of Bank's assets or stock, or (b) in connection with the sale or other disposition involving a line of Bank's business to which this Agreement relates. Bank will use reasonable efforts to notify Customer of any such assignment. Customer expressly reserves its right to terminate any or all Services in the event of any such transaction.

## SECTION 23. GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL

This Agreement and any claims or disputes relating to or arising out of this Agreement or the Services shall exclusively be governed by, and construed in accordance with, the laws of the State of Ohio, without regard to Ohio's conflict of law principles, and with applicable federal laws and regulations. Customer irrevocably submits to the nonexclusive jurisdiction of the courts of the state and federal courts located in Hamilton

County, Ohio and agrees that any legal action or proceeding with respect to this Agreement may be commenced in such courts. EACH PARTY HERETO EXPRESSLY, IRREVOCABLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

## SECTION 24. MISCELLANEOUS

***Section 24.1. No Extension of Credit.*** Except as expressly provided in the applicable Service Terms, nothing in this Agreement or any Related Agreement requires Bank to extend any credit of any type (including, but not limited to, any Overdraft), even if Bank has done so in the past.

***Section 24.2. Notices.*** Except as otherwise specifically provided in the Service Terms, including the Implementation Materials with respect to a particular Service, notices under this Agreement shall be provided in writing by nationally recognized overnight courier, hand delivery, U.S. Mail or email. The Bank also reserves the right to provide notice to Customer electronically via email or posting to the Bank's online platform, each of which Customer agrees will be considered "*in writing*." The address for notices to Customer will be the address the Bank has in its records with respect to this Agreement or the particular Service, as applicable. The address for notices to Bank will be as the Bank specifies to Customer in writing, including in the Implementation Materials. Notices shall be deemed effective: (a) when received, if sent by overnight courier or hand delivery; (b) within five (5) days if sent by U.S. Mail; or (c) when sent or posted, if provided via email or posting to the Bank's online platform.

***Section 24.3. Information and Audit.*** In order for Bank to comply with its obligations under Applicable Law and the Operating Rules, upon Bank's request Customer agrees to: (a) provide the records Customer maintains with respect to Customer's use of Services as required by Applicable Law, the Operating Rules, and this Agreement, (b) provide internal and external audit reports relating to Customer's use of the Services and Customer's information technology infrastructure and operational processes and procedures, and (c) permit Bank (including its regulators and auditors) reasonable access during normal business hours to audit Customer's (including Customer's Vendors) compliance with the terms of this Agreement, Applicable Law and the Operating Rules.

***Section 24.4. Counterparts.*** The Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute a single instrument.

***Section 24.5. Severability.*** If performance of Services in accordance with the terms of this Agreement would result in a violation of any Applicable Law, then this Agreement and any Related Agreement shall be deemed amended to the degree necessary to comply with such Applicable Law, and Bank shall incur no liability to Customer as a result of such violation or amendment. If any provision of this Agreement is held to be invalid, illegal or unenforceable, such provision shall be valid, legal and enforceable to the maximum extent permitted by such holding and the validity, legality, or enforceability of the other provisions of this Agreement will not be affected or impaired by such holding.

***Section 24.6. Headings.*** Headings are for reference purposes only and are not part of this Agreement.

***Section 24.7. Waiver.*** No party's failure or delay in exercising any right or remedy under this Agreement will operate as a waiver of such right or remedy, nor shall any waiver by either party of any breach of the other party's obligations under this Agreement operate as a waiver of any prior, current or subsequent breach. No waiver will be effective unless made in writing.

***Section 24.8. Electronic Execution and Consent.*** The parties agree that this Agreement, the Related Agreements and any Service Terms are entered into on an interstate basis and agree that the Agreement and Services are subject to the Electronic Signatures in Global and National Commerce Act and may be executed and delivered by facsimile, electronic mail in PDF or similar format, or other electronic method, and that the copies or counterpart signature pages so sent shall be treated and have the same force and effect as delivery of an original with a manual signature. Customer agrees and consents that Bank may, at its option, send to Customer any record, notice, disclosure, account statements and other information via electronic means (including through a Channel Service), including information that Bank is required by Applicable Law to provide to Customer in writing. Electronic communication methods include methods Bank employs that deliver visual text or images to be displayed on a computer or mobile device screen, such as e-mail, SMS or other mobile phone text, and posting through a Channel Service. Customer consents to receive account statements and other notices from Bank electronically. Bank may, however, require that Customer deliver an original of this Agreement and any Related Agreement with a manual original signature.

## SECTION 25. AFFILIATES

***Section 25.1. Joinder.*** By executing this Agreement, Initial Customer, each Affiliate listed below (if any), and Bank agree that each such Affiliate shall have all of the rights and obligations of, and shall for all purposes be a party under this Agreement as a "*Customer*." Additional Affiliates can be added through an addendum to this Agreement in the form required by Bank and executed by Initial Customer and Bank.

***Section 25.2. Affiliate Representation, Warranty and Covenant.*** Initial Customer represents, warrants and covenants to Bank that: (a) Initial Customer has the authority to use the Services and access the Accounts on behalf of each Affiliate as permitted by this Agreement, (b) each entity signing this Agreement as an Affiliate meets the definition of Affiliate and shall continue to meet such definition as long as the entity receives or uses the Services, and (c) the individual signing this Agreement is duly authorized to execute this Agreement on behalf of each Affiliate. Each Affiliate hereby agrees to be bound by the terms of this Agreement for the use of the Services.

***Section 25.3. Role of Initial Customer; Responsibility.*** Each Affiliate hereby authorizes Initial Customer, and Bank may rely on Initial Customer's authority, to act as agent for such Affiliate in connection with any and all matters relating to the Agreement, including, without limitation, administering the Services and originating transactions (i.e., ACH, wire, other electronic funds transfer or check), executing Implementation Materials, acceptance and allocation of the payment of interest or earnings credits, terminating the Agreement, collection and negotiation of items for deposit, agreeing to modifications and amendments to the Agreement, adding new Affiliates, and receiving notices under the Agreement (which will be effective against the Customer, even if such notices and communications are sent only to Initial Customer); any and all such actions by the Initial Customer shall be binding on the Affiliates. Each Affiliate

agrees that it is responsible for the payment of Fees or maintenance of required balances for the Services that it receives from Bank, and for all obligations and liabilities it incurs.

***Section 25.4. Single Channel Access.*** Initial Customer and any Affiliate acknowledge and agree that the Security Procedures provided by Bank to the Initial Customer shall be used in order to use the Services, and that such Security Procedures are commercially reasonable for the Instructions to be provided on behalf of each Affiliate. As such, each Customer acknowledges and agrees that (a) Bank may rely on and act on any and all communications and Instructions it receives through a Access Channel using the Security Procedures assigned to the Initial Customer and Bank's reliance shall not constitute negligence or willful misconduct or bad faith, (b) each Customer shall be bound by such use of the Services and any Instructions (including funds transfers) and liable for any transactions debiting the Account of the Affiliate, and (c) Bank shall have no liability or responsibility for notifying any Affiliate with which Initial Customer shares its Security Procedures. Each Affiliate and Initial Customer understand and agree that use of the Services and any transactions affecting each Affiliate's Accounts may be reflected on the records of Bank as initiated by the Initial Customer.

***Section 25.5. Guarantee.*** Initial Customer unconditionally and irrevocably guarantees to Bank the full and prompt payment and performance by each Affiliate of all obligations they or any of them may incur under this Agreement, now or in the future, including, but not limited to, obligations for Fees and indemnification. Initial Customer further agrees that unless and until the full amount owing to Bank by the Affiliates under this Agreement have been paid in full, that Initial Customer will not exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to Initial Customer against such Affiliate. If any Affiliate's payment applied by Bank to such Affiliate's obligations under this Agreement is set aside, recovered, rescinded, or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency, or reorganization of such Affiliate), then Initial Customer's obligations and liabilities under this Agreement will be enforceable as fully as if such application had never been made. Initial Customer agrees to pay any and all such amounts upon demand by Bank. **Initial Customer acknowledges and agrees that Initial Customer's guarantee is provided for good and valuable consideration, as Bank would not have otherwise permitted Affiliate(s) to use the Services as permitted for and requested by Initial Customer under this Agreement without the foregoing guarantee.**

## SECTION 26. DEFINITIONS

***"Account"*** or ***"Accounts"*** means one or more commercial deposit accounts at Bank that is maintained or controlled by Customer, including accounts held by Customer's Affiliates or other third parties that have granted authorized access to Customer, including through the Channel Services.

***"Affiliate"*** means any entity in which Initial Customer maintains a direct or indirect ownership interest.

***"Applicable Law"*** means all applicable federal and state laws, rules and regulations as in effect from time to time governing or relating to the Agreement or the Services, including, without limitation, the Operating Rules and the rules of any funds transfer system, and the rules of, and regulations administered by, the Office of Foreign Assets Control of the U.S. Treasury Department.

***"Available Funds"*** means those funds that are made available for immediate withdrawal in an Account with Bank in accordance with Bank's Funds Availability Policy.

***"Business Day"*** means any day other than a Saturday, Sunday, holiday or other day on which the Bank is required or permitted to be closed.

***"Credentials"*** means the user name, personal identification numbers, identification codes, passwords and other identifying and authentication inputs, security token or authentication device, equipment or software that the Customer uses to access the Services.

***"Customer Measures"*** means reasonable procedures, policies, internal controls and measures including reasonably available software design to ensure the secure and authorized use of the Services and Channel Services including, as appropriate for Customer and its use of Services: (a) comprehensive legal compliance, business continuity and data protection programs, (b) security and data protection software and technology, including firewalls; (c) regularly monitoring the Accounts and use of the Services; (d) control of user Credentials; (e) ongoing training and education to management, employees, and Vendors on the secure use of the Services and various forms of threats to security including email scams, phishing and similar attacks; and (f) regular auditing of Account activity and assessment (at least annually) of the security of its information technology infrastructure and Customer Measures.

***"Cutoff Time"*** means the time on any Business Day when Bank will no longer accept Instructions or process transactions (including Payment Orders) for that Business Day and any such Instructions received after such time, if accepted, and transactions processed on that day will be processed as of the next Business Day.

***"Implementation Materials"*** means any documents that facilitate the use of a Service, specifications, set-up and sign-up forms provided by Bank, and those completed and submitted by Customer, including electronically, and written Security Procedures.

"***Initial Customer***" means the entity signing as the "Customer" on the signature page to this Agreement.

***"Instruction"*** means any Payment Order, other wire transfer instruction, ACH Entry (as defined in the Operating Rules), file, batch release, request, instrument or other message, instruction or direction provided using Customer's Security Procedures, or otherwise provided by or on behalf of Customer to Bank to perform a Service or take action on behalf of Customer or its Accounts.

***"Losses"*** means any and all claims, actions, demands, losses, damages, judgments, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) and all costs of settlement of claims.

***"Operating Rules"*** means the rules, regulations and operating guidelines of the National Automated Clearinghouse Association and those of any regional clearinghouse, payment card association (e.g., MasterCard Incorporated), or any payment network (e.g., SWIFT, ECCHO, The Clearing House Payments Company L.L.C., Fedwire Funds Service) in effect from time to time used by Bank to provide the Services.

***"Payment Order"*** has the meaning ascribed thereto in Article 4A of the UCC, and shall include, but not be limited to, instructions given for the use of any Service for the origination, processing and payment of electronic funds transfers, including any wire transfers, ACH Entries, and any internal funds transfers between Accounts.

***"Processors"*** means any third-party processors engaged by Bank to provide any part of the Services.

***"Related Agreements"*** means the Service Terms, Commercial Account Rules, Fee agreement, the OCAA, and any resolution or other document establishing Customer's authority to engage in the Services and open Accounts with Bank and appoint individuals as Authorized Agents.

***"Security Procedures"*** means the Credentials, call-back protocols, and other systems, software and procedures provided by Bank, its Processors or any payment network for authenticating Instructions, transactions and use of the Services.

***"Service Terms"*** means the terms and conditions for the Services provided by Bank to Customer under this Agreement, including the Treasury Management Services Terms & Conditions Book available at 53.com/tm-tc and any Implementation Materials.

***"Services"*** means the treasury management services described in this Agreement, the OCAA and the Service Terms or otherwise incorporated herein.

***"UCC"*** or ***"Uniform Commercial Code"*** means the Uniform Commercial Code, as enacted in the State of Ohio.

***"Vendor"*** means any third-party service provider used by Customer in connection with the Services or to whom Customer gives access to any Service, including through the Channel Services.

*[Signature Page Immediately Follows]*

In Witness Whereof, the parties have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

**CUSTOMER NAME:**

Hegira Health Inc.

Tax ID: [redacted]

By: ____________

Print name: Robert Davidge

Print title: CFO

**NOTE: If required by resolution, second officer of Customer must sign below:**

By: ____________

Print name: ____________

Print title: ____________

**Signing as a duly authorized officer or agent of each of the Affiliates listed below:**

By: ____________

Print name: ____________

Print title: ____________

**FIFTH THIRD BANK, N. A.:**

By: Cussandra McAfee

Print name: Cussandra McAfee

Print title: Client Advisor I, Officer

Date: 01/20/2022

This Agreement includes the following Affiliates:

| Affiliate Name: | Tax ID No.: |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |