# Exhibit B

FIFTH THIRD BANK

38 Fountain Square Plaza
Cincinnati, Ohio 45263

# Online Channel Access Agreement

This Online Channel Access Agreement ("*Agreement*") is between the undersigned "*Customer*" and Fifth Third Bank, NA ("*Bank*") and is effective as of the later date executed by Bank and set forth on the Signature Page (the *"Effective Date"*). Capitalized terms shall have the meaning provided in this Agreement, including Section 16 below, or if not defined in this Agreement, the meaning provided in the Commercial Account Rules.

## SECTION 1. CHANNEL SERVICES.

***Section 1.1. Description.*** Channel Services enable access to, and electronic management of, the Services and Accounts that Bank provides. Bank reserves the right to add Channel Services, enhance the functionality and features of the Channel Services and extend the application of the Channel Services to other Services at any time without notice. Information provided through the Channel Services about an Account is provided "as is," changes frequently and is subject to updating, verification and correction. Information Customer obtains through a Channel Service is not the official record of the Account or any transaction unless otherwise specified. Bank assumes no responsibility for Customer's reliance on any Account or Service information subsequently updated, verified or corrected.

***Section 1.2. Services and Implementation.*** Each of the Services is governed by the applicable Bank Agreements including this Agreement and as elected by Customer in the Implementation Materials. Nothing in this Agreement expands, changes, limits or restricts any of the respective obligations or rights of the parties under the applicable Bank Agreements. It is the intention of the parties that this Agreement and each Bank Agreement be construed and interpreted to give effect to the respective provision of each to the greatest extent practical. To the extent of any conflict between this Agreement and the Bank Agreements with respect to the Channel Services the terms of this Agreement shall control. If Bank is not a party to the Bank Agreement, Customer acknowledges and agrees that Bank is providing the Channel Services in conjunction with the provider of the Services under that Bank Agreement and consents to all access to the Services provided through this Agreement. Customer acknowledges and agrees that Bank may arrange for certain or all of the aspects of the Services, including software and processing to be performed or provided, by Processors engaged by Bank and that Customer shall have no rights or remedies against any such Processor for the Services, but only against Bank. Bank's Processors are obligated to comply with the confidentiality, privacy and security requirements of this Agreement. Bank is liable and solely responsible for the aspects of the Service provided by its Processors.

***Section 1.3. Intellectual Property.*** Bank and its Processors or other third parties involved in providing the Channel Services (if any) own and exclusively retain any and all patent, trademark, copyright or trade secret rights (collectively referred to as *"Intellectual Property Rights"*) and any related rights associated with the Channel Services and the software, design, functionality, processes, procedures, systems, know-how, inventions, sales materials, technical materials, Channel Documentation and other materials provided in connection with the Channel Services as well as the content and other works of authorship provided, displayed or published in connection with the Channel Services. Customer further acknowledges and agrees that Bank or its Processors or such other third parties, as the case may be, shall exclusively own all Intellectual Property Rights in and to any and all improvements, enhancements, derivative works, modifications, or developments made to or resulting from any of the foregoing, including those developed, worked on, learned, or conceived by Bank or its Processors in connection with providing the Channel Services to Customer, and Customer assigns any such rights to Bank or its designee. Customer's sole right is to use the Channel Services as provided in this Agreement.

***Section 1.4. Availability.*** While Bank will use commercially reasonable efforts to have its Channel Services available at all times, one or more of the Channel Services may be temporarily unavailable due to routine or unscheduled maintenance or upgrades, or the occurrence of unauthorized activity or other events or circumstances beyond Bank's control including economic and political events, periods of high volume, and system attacks and Bank's response to such events or circumstances. Customer agrees that Bank shall not be liable if a Channel Service is not available for use at any time.

***Section 1.5. Third Party Software and Linked Sites.*** The Channel Services may provide the opportunity to use or access software or services that are not part of the Channel Services or Services (*"Third-Party Software"*) and links to the websites of third parties (*"Linked Sites"*) but are each provided by a third party other than a Processor (*"Third-Party Provider"*). Use of Third-Party Software and Linked Sites through links or otherwise is solely at Customer's election, risk and expense. Customer is responsible for obtaining and complying with the Third-Party Provider's license or terms of use. Except where Bank explicitly provides otherwise in a Bank Agreement or this Agreement, Bank does not endorse or assume any responsibility for any such Third-Party Software, Linked Site or for any service provided by or other obligation of the Third-Party Provider to Customer. Customer agrees that the Third-Party Provider (and not Bank) is solely liable and responsible to Customer for any content, services, any problems or claims with respect to the Third-Party Software or Linked Site including any security or data breach.

***Section 1.6. Mobile Apps.*** Bank's Mobile Apps enable access to certain Channel Services through the use of a supported electronic wireless device, such as a smartphone or tablet device (*"Mobile Device"*). The Mobile App for Fifth Third Direct is available to Users that have been granted User Rights, some of which may only be enabled in the set-up and implementation process. Customer agrees that, where required, the acceptance by Users of software and terms of use associated with the acquisition of a Mobile App is authorized by Customer and shall be binding upon Customer and each User. In addition to any fees disclosed by Bank to Customer for use of the underlying Channel Services or Services accessed through Mobile Apps, Customer and any User may incur charges from its telecommunications carrier for use of the Mobile App. Bank is not responsible for any such charges that Customer or Users may incur. The use of Mobile Apps presents unique risks in addition to those associated with the use of the Internet generally. Those risks include the potential loss or compromise of a Mobile Device with a Mobile App, the increased exposure to potential unauthorized access to communications and to malware and similar invasive software. Customer assumes all risks of using the Mobile Apps for the Channel Services any Services by all of its Users and are responsible for managing the use and security of the Mobile Devices to combat these and other risks associated with mobile banking.

***Section 1.7. Risks of Internet Use.*** Since the Internet is inherently unsecure and since there is a risk that data communications and transfers through the Channel Services may be subject to interruption, interception, failure, unavailability, delay or unauthorized access or dissemination (*"Failure Events"*), Bank agrees to take commercially reasonable steps to maintain the security of such data communications and transfers, including using encryption and other industry standard security features. Except where Bank is negligent in failing to take such commercially reasonable steps, Bank shall not be liable for any Failure Events that occur,

including any loss of privacy or data, or use by others of such data communications or transfers. Under no circumstances, shall Bank be liable for any Failure Events that occur prior to Customer or the User establishing a secure connection to Bank's authorized portal or after properly terminating that connection.

## SECTION 2. PROCESS.

***Section 2.1. Set Up and Implementation.*** Customer may elect to enable Channel Services for one or more Services through the corresponding Bank Agreement or this Agreement. In the set up process for a new or added Channel Service, Bank requires that Customer provide Bank with information necessary to establish the Channel Service and establish the User Rights of the Customer's Users, including those executing this Agreement and any Channel Service Schedule, and providing set up information to Bank. Bank may rely on the information provided to Bank by Customer in this process in establishing and providing the Channel Services to Customer. Any changes by Customer to the information provided to Bank must be made in writing and will not be effective until received by Bank has had a reasonable opportunity to act or such changes.

***Section 2.2. Limited Use.*** Bank grants Customer, for Customer's internal business purposes solely in connection with a Service, a non-exclusive, non-transferable, limited and revocable right to use and access the Channel Services. Customer agrees to use the Channel Services only in connection with the Services for legitimate business purposes and only in accordance and in compliance with Applicable Law. Bank provides the Channel Services for the sole and exclusive benefit of Customer and Customer's Affiliates who become a party to this Agreement. Customer agrees not to access, or allow Users to access, the Channel Services from any country where such use or access is prohibited by United States sanctions regulations, Applicable Law or local law. If access to any software is provided through the Channel Services, Customer agrees not to download the software outside the United States. Any Vendor used by Customer in connection with the Channel Services or to whom Customer gives access to any Service including through the Channel Services is Customer's agent and not Bank's, and Customer is liable and solely responsible for: (a) any Vendor's failure to comply with this Agreement and manage Account information, transmit Instructions and other directions and decisions to Bank and other online features as described in this Agreement or the Bank Agreement including any Security Procedures or operating requirements relating to the Channel Services; and (b) all fees, costs and expenses owed to each Vendor for its services.

***Section 2.3 Fees; Setoff.*** Fees associated with the Channel Services, if any, are specified in the applicable Channel Service Schedule, or as separately agreed by the parties in writing. In addition, Customer is subject to fees, interest and other charges as required under the applicable Bank Agreement. Customer and Users shall be responsible for any internet access or telecommunications charges they incur in connection with the use of the Channel Services including use of a Mobile Device. Customer agrees that, in the event Customer fails to pay the amount of fees due and owing under this Agreement, Bank may set off against an Account held by Customer at Bank to pay the amount of such fees, interest or charges (excluding any Account expressly titled to clearly demonstrate that the Account is held by Customer in a fiduciary or representative capacity for a third party such as, for example, a custodial Account).

***Section 2.4. Restrictions.*** Customer agrees that it will not, and will not allow its employees, contractors, agents or Vendors to, directly or indirectly: (a) decompile, reverse engineer, disassemble or otherwise attempt to derive source code or trade secrets relating to the Channel Services; (b) copy (except in the case of normal backups and archival copies), reproduce, or incorporate any portion of the Channel Services, or seek to circumvent any restrictions or measures controlling access to the Channel Services; (c) license, lease, encumber, distribute, resell, or otherwise transfer, co-brand, frame, or link any portion of the Channel Services; or (d) adapt, modify, transform or create derivative works of, any aspect of the Channel Services (including the removal or alteration of any copyright, trademark or proprietary rights notice).

## SECTION 3. CHANNEL ADMINISTRATION.

***Section 3.1. Channel Administrator.*** The administrative features for the management of the Channel Services are controlled and managed by Customer's Channel Administrator(s). The Channel Administrator has broad authority to manage the Channel Services including the authority and responsibility to appoint additional Channel Administrators with the authority for one or more Services, which includes the authority to:

- select and configure features and Channel Services for Customer's specific requirements;
- designate and delete Users, and assign and administer User Rights (except where Bank specifically reserves this right to itself in a Channel Service Schedule or Bank Agreement);
- select and administer Security Procedures and User controls, including transaction approval controls related to the Channel Services;
- enable use of Mobile Apps for Users for certain Services;
- accept and act on all communications from Bank regarding the Channel Services; and,
- designate itself as a User with rights to the Channel Services for some or all of the linked Services.

Customer understands that Customer may, at its option, enable multiple or separate Channel Administrators for each Service. If Customer has included Affiliates under this Agreement, Customer may designate separate Channel Administrators for each Affiliate and the Affiliate's Services or may have a common Channel Administrator for one or more Affiliates. The Channel Administrators (set up by Bank on Customer's instructions in the implementation process) may also have authority for Channel Services over all Affiliates.

***Section 3.2. Designation and Authority.*** (a) Customer will appoint a person or persons to serve as the Channel Administrator or Channel Administrators in writing on a form or forms Bank requires in the implementation process or if Customer does not then have an acting Channel Administrator. Customer agrees to not permit the sharing of Credentials or the use of any Credentials except by the person authorized by Customer or the Channel Administrator.

(b) The Channel Administrator has complete authority to manage Customer's use of the Channel Services including enabling User Rights. As part of the set up and implementation process, Bank will provide the Channel Administrator designated by Customer with its initial sign-on credentials and establish the Services to which he or she shall have access. The Channel Administrator must then establish its own password. Customer is solely responsible for maintaining the privacy and security of the Credentials once established and for any use of the Channel Services and Services associated with those Credentials.

(c) The Channel Services may allow the Channel Administrator to set transaction limitations, establish controls, develop templates, manage Credentials (other than User IDs provided by Bank) and utilize security features for the Channel Services. Failure to properly implement and manage limitations, controls, and security features increases the risks of, and Customer's exposure to, unauthorized transactions.

(d) Bank offers and recommends that Customer establish the following controls when sending Instructions using the Channel Services: (i) "*Dual Administration Control*," meaning that the approval of a second Channel Administrator is required to verify the designation and authorization of a User, and (ii) Dual Transaction Approval, meaning that the approval of an additional User designated by the Customer is required to originate and approve a Payment Order. Bank may require that Customer establish Dual Administration Control and Dual Transaction Approval for certain types of Instructions or transactions. Bank will rely on the authority of the Channel Administrator and Users designated by the Channel Administrator until Bank receives written notice of a change from an authorized representative of Customer and Bank has had a reasonable opportunity to act on and approve the notice.

## SECTION 4. SECURITY AND SECURITY PROCEDURES.

***Section 4.1. Effect.*** Access to Channel Services is subject to Security Procedures that Bank establishes with Customer. All use of the Channel Services through the Security Procedures will be deemed to have been authorized by Customer. Each Instruction sent to Bank through the Channel Services by a User using the User's Credentials and applicable Security Procedures will be treated by Bank as authorized and shall bind Customer. Customer is responsible for the accuracy, completeness and timeliness of all such Instructions sent through the Channel Services. The Security Procedures are not designed to detect errors in any communications to Bank or other use of the Channel Services. Use of the Services by Users themselves may be subject to the same or additional Security Procedures as required by the Bank Agreement or this Agreement. Bank may update its requirements with respect to Credentials by giving Customer notice through the applicable Users and Channel Administrator.

***Section 4.2. Safeguarding the Security Procedures.*** Customer agrees to maintain the security and confidentiality of the Security Procedures and Implementation Materials. Customer's failure to protect the confidentiality and integrity of the Security Procedures may enable an unauthorized person to use the Channel Services and access Customer's Accounts and data, and transfer funds from Accounts. Customer must notify Bank as soon as reasonably possible if there has been a breach of its security, or any Security Procedure have been lost, stolen, misused or compromised. Customer should contact its relationship manager, Bank's customer support services or contact person indicated in the Channel Documentation. If a User

is no longer authorized, Customer is responsible for terminating that User's User Rights. Bank may suspend the Channel Services if Bank believes the security of the Channel Services has been compromised.

***Section 4.3 Customer Responsibilities.*** In addition to using and protecting the Security Procedures, it is Customer's responsibility to: (a) institute and use current and reasonable measures to mitigate the risks associated with the access to and use of the Channel Services and Services; (b) institute and enforce effective policies and procedures to control the use of the Channel Services, and ensure that its personnel use the Channel Services only as authorized and within the limits of their permission or authority; and (c) carefully monitor the activities of the Users using the Channel Services for compliance with this Agreement and Customer's internal control policies and require Users to maintain the safety and confidentiality of their Credentials including by regularly changing their passwords. In addition to taking these measures, Customer acknowledges that Bank offers certain tools designed to assist Customer in controlling the incidence of unauthorized use of the Channel Services. If Customer chooses not to implement Customer Measures, and the proper use of that Service or Customer Measure could reasonably have prevented Losses due to the incidence of fraud, or unauthorized activity Customer shall hold the Bank harmless for such Losses that could have reasonably been prevented.

***Section 4.4. Customer Systems.*** Customer is responsible for having and maintaining functioning hardware, software, infrastructure, mobile and other communication devices, Internet access and service and information technology systems including reasonable and current security features and protections (collectively *"Customer Systems"*) necessary for use with the Access Channels and for meeting the technical specifications set forth in the Channel Documentation. Customer is responsible for any malfunction, compromise, security breach or other misuse or problems with the Customer Systems and for the information transmitted and received through the Customer Systems.

***Section 4.5. Additional Authentication.*** Bank has no duty to monitor Customer's use of the Channel Services. Bank may, however, in its discretion, apply a variety of techniques and programs that may trigger a requirement for a User to respond to an email or message from Bank to provide additional authentication before permitting certain actions of the User including a change in User's profile and certain transactions. Users will not be able to complete the desired actions until additional authentication is provided. Customer is not entitled to rely on these programs or techniques as a substitute for its own internal control of the activities of its Users.

***Section 4.6. Access through Third-Party Provider SSO.*** In certain instances, Bank may allow Customer to access the Channel Services, and other Services accessible to Customer through the Channel Services, by signing on through a Third-Party Provider's internet site without signing-on using the Security Procedures ("*Single Sign-On*" or "*SSO*"). Any SSO will be subject to the terms of use of the Third-Party Provider. In the event Customer accesses the Channel Services using SSO, then Customer agrees that it has waived use of the Security Procedures to access the Channel Services, and that Bank may accept and act upon Instructions received using Security Procedures assigned to Customer following Customer's use of SSO. All use of the Channel Services and Instructions submitted subsequent to SSO from a

Third-Party Provider internet site will be deemed to have been authorized by Customer. Each Instruction sent to Bank through the Channel Services by a User using the User's Credentials and applicable Security Procedures subsequent to SSO from a Third-Party Provider internet site will be treated by Bank as authorized and shall bind Customer.

## SECTION 5. ELECTRONIC COMMUNICATIONS; CONSENT.

The parties agree that this Agreement and the Bank Agreements are entered into on an interstate basis and agree that those Agreements and Services and Channel Services are subject to the Electronic Signatures in Global and National Commerce Act and may be executed and delivered by facsimile, electronic mail in PDF or similar format or other electronic method. Customer agrees and consents that Bank may, at its option, send to Customer any record, notice, disclosure, Account statements and other information including information that Bank is required by Applicable Law to provide to Customer in writing via electronic means (including through a Channel Service.) Electronic communications include commercially reasonable electronic communications methods Bank employs that deliver visual text or images to be displayed on a computer or mobile device screen (such as e-mail, SMS or other mobile phone text, and posting through a Channel Service). This is Customer's consent to receive Account statements and other notices from Bank electronically. Bank's records as to the executed Agreement shall be controlling. Bank may, however, require that Customer deliver an original of this Agreement with a manual original signature.

## SECTION 6. NOTIFICATIONS.

***Section 6.1. Establishment.*** Users are required to accept certain administrative emails and text notifications and may elect to receive certain other email, SMS or other mobile phone text notifications relating to an activity, status or action relating to their Channel Services and any Services, including for additional authentication Bank or Customer may require (all such emails, SMS and texts, *"Notifications"*). The Notification feature is set up by each User and depends on the User specifying a valid and current email address or phone number. Customer consents to the sending of Notifications to Users, including to any Mobile Devices and through any Mobile App, and understands that such messages could result in charges to the Users or Customer for such messages from the carriers of such messages.

***Section 6.2. Informational Use.*** Notifications are provided for Customer's and User's information and convenience only, not as a replacement of or substitution of any Services. Customer acknowledges and agrees that is it Customer's responsibility to access the Channel Services or the applicable Services in order to view transactions and information regarding activity on its Accounts, and otherwise take appropriate action in reaction to any Notifications and in compliance with the terms of the applicable Service. Customer's receipt or lack of receipt of any Notification has no effect on the validity of transactions or information. Notifications do not constitute a Bank record and are not intended as a substitute for proper Account management or regular use of Bank's account management or other information related Services.

***Section 6.3. Delivery Risks.*** Notifications may be delayed or prevented by a variety of circumstances beyond Bank's control. Bank does not guarantee the delivery of any

Notifications. Notifications are sent via the Internet or wireless networks without being encrypted or otherwise coded in any way. Bank will not be liable in any way for non-delivery, delayed or wrong delivery of Notifications, the content in Notifications, or Customer's use of, or reliance on, the absence of any Notification for any purpose. Replies to a Notification are not permitted and will not be read or acted upon.

## SECTION 7. BANK REPRESENTATIONS AND WARRANTIES.

Bank represents and warrants to Customer that: (a) Bank is duly organized, validly existing, and in good standing in the jurisdiction in which Bank is organized; (b) the execution, delivery and performance by Bank of this Agreement has been authorized by all necessary corporate and governmental action; (c) the person(s) signing this Agreement is duly authorized to do so; (d) this Agreement represents Bank's legal, valid and binding obligation; and (e) execution and performance of this Agreement and provision of the Channel Services does not violate any Applicable Law, Bank's bylaws or any material agreement by which Bank is bound. No descriptions or specifications constitute representations or warranties of any kind. Bank is acting as an independent contractor in providing the Channel Service and not as Customer's agent or as a fiduciary. EXCEPT AS EXPRESSLY SET FORTH ELSEWHERE IN THIS AGREEMENT, BANK MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, OF ANY KIND WITH RESPECT TO ANY ACCESS CHANNELS OR CHANNEL SERVICES OR OUR PERFORMANCE OF ANY SERVICES OR THE CHANNEL SERVICES, INCLUDING, WITHOUT LIMITATION, THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NO DESCRIPTIONS OR SPECIFICATIONS CONSTITUTE REPRESENTATIONS OR WARRANTIES OF ANY KIND.

## SECTION 8. CUSTOMER REPRESENTATIONS AND WARRANTIES.

Customer represents and warrants to us that: (a) Customer is duly organized, validly existing, and in good standing in the jurisdiction in which Customer is organized, and is validly qualified in any other jurisdiction where Customer does business and is required to be qualified except where the failure to be so qualified would not have a material adverse effect on Customer; (b) the execution, delivery and performance by Customer of this Agreement including each Channel Service Schedule and the Implementation Materials has been authorized by all necessary entity and governmental action; (c) each person signing this Agreement including each Channel Service Schedule and the Implementation Materials on Customer's behalf is duly authorized to do so; (d) this Agreement, including each Channel Service Schedule, represents Customer's legal, valid and binding obligation; (e) the execution and performance of this Agreement including each Channel Service Schedule, and the use of the Channel Services do not and will not violate in any material respect any Applicable Law, Customer's entity governing documents, or any material agreement by which Customer is bound; and (f) each transaction Customer conducts, and each Account Customer has with Bank is conducted or maintained for a business or commercial purpose and not a personal, family or household purpose. Customer reaffirms these representations and warranties each time it executes a Channel Service Schedule and each time it uses a Channel Service and agrees to promptly notify Bank if any representation or warranty made by Customer is no longer true.

## SECTION 9. COMPLIANCE

This Agreement and the use and provision of the Channel Services are subject to all Applicable Law. Each party agrees to comply with Applicable Law in using or providing the Channel Services, as the case may be. Customer agrees to comply with the requirements of the Channel Documentation provided for the Channel Services.

## SECTION 10. LIMITATION OF LIABILITY.

CUSTOMER AGREES TO THE MAXIMUM EXTENT PERMITTED BY LAW THAT IN ADDITION TO ANY OTHER LIMITATION ON BANK'S LIABILITY IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY CHANNEL SERVICE SCHEDULE OR BANK AGREEMENT, IN NO EVENT WILL BANK (OR ITS OFFICERS, DIRECTORS, SHAREHOLDERS, AFFILIATES, EMPLOYEES OR AGENTS) BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR SPECULATIVE LOSSES, EXPENSES, INJURY, COSTS OR DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, REVENUE, SAVINGS, TIME, DATA, GOODWILL AND OPPORTUNITIES, ATTORNEYS' FEES, AND COURT AND OTHER DISPUTE RESOLUTION COSTS) THAT CUSTOMER OR ANY OTHER PERSON MAY INCUR OR SUFFER IN CONNECTION WITH THIS AGREEMENT OR ANY CHANNEL SERVICE PROVIDED BY BANK, EVEN IF BANK HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS, COST OR DAMAGE AND REGARDLESS OF THE TYPE OF CLAIM. IN THE CASE OF ANY CONFLICT BETWEEN ANY LIMITATIONS OF LIABILITY IN THIS AGREEMENT INCLUDING A CHANNEL SERVICE SCHEDULE, OR A BANK AGREEMENT, THE BROADER LIMITATION SHALL CONTROL TO THE MAXIMUM EXTENT PERMITTED BY LAW.

Customer further agrees, to the maximum extent permitted by law, that Bank's liability to Customer arising from any Channel Service will be limited to actual monetary damages that are the direct result of Bank's negligence or willful misconduct. Notwithstanding the foregoing, for any Instructions that are Payment Orders which are governed and subject to UCC Article 4A, Bank is liable only for damages required to be paid under UCC Article 4A. In addition to the foregoing limitation, in the instance of any overbilling by Bank that is timely reported by Customer as required by this Agreement, Bank's liability shall not exceed the amount overbilled by and paid to Bank by Customer. In no instance shall Bank be responsible or liable for (a) any act or omission of Customer's officers, employees or agents, or of any third party (other than Bank's Processors), (b) any failure to act by Bank if Bank reasonably believed taking the omitted action would have violated Applicable Law, or (c) any interception of information relating to the Customer or its transactions as a result of Customer's use of the Internet or other Access Channel that is not the result of Bank's gross negligence or willful misconduct. Customer agrees that Bank's liability to Customer for any Services is also subject to any further limitations of liability set forth in an applicable Channel Service Schedule or Bank Agreement.

## SECTION 11. INDEMNIFICATION OBLIGATIONS

***Section 11.1. Customer.*** To the fullest extent not prohibited by Applicable Law, Customer agrees to indemnify and hold Bank and its officers, directors, employees, affiliates, shareholders and agents harmless from and against any and all *Losses* resulting directly or indirectly from, or arising in connection with: (a) Customer's breach of any of Customer's agreements, representations, warranties or covenants in this Agreement or any Channel Service Schedule; (b) Customer's violation of Applicable Law in connection with any Channel

Service or this Agreement; (c) Customer's use of the Channel Services and Bank's complying with or carrying out any Instruction or other direction given to Bank in accordance with this Agreement, any Bank Agreement or a Channel Service Schedule; or (d) a claim or action of a Third Party Provider or Vendor. Customer is not, however, obligated to indemnify Bank or hold Bank harmless for any Losses directly resulting from Bank's gross negligence or willful misconduct.

***Section 11.2. Bank.*** To the fullest extent not prohibited by Applicable Law, Bank agrees to indemnify and defend or settle at its expense any action brought against Customer to the extent that it is based on a claim that a Channel Service as used by Customer in accordance with this Agreement directly infringes a U.S. copyright, trademark or patent or constitutes misappropriation of a third-party trade secret, provided, however, that Customer: (a) promptly notifies Bank in writing of such claim; (b) has not made any admission of liability or agreed to any settlement or other material issue relating to such claim; (c) reasonably cooperates with Bank at Customer's expense in the defense or settlement; and (d) at Bank's request, gives Bank sole control and authority over all aspects of the defense or settlement of such claim.

## SECTION 12. TERM AND TERMINATION.

***Section 12.1. Term.*** This Agreement is effective as of the Effective Date and shall remain in effect until terminated by either party as provided in this Agreement; provided, that in the event any Bank Agreement or Service is terminated then the Corresponding Access Channel or Channel Service Schedule will also be terminated, but without terminating this Agreement. This Agreement or any Channel Service Schedule may be terminated by either party at any time by giving thirty (30) days' prior written notice of termination to the other party.

***Section 12.2. Bank Termination.*** Bank may terminate this Agreement or terminate or suspend any or all of the Channel Services immediately if (a) Customer breaches a material obligation under this Agreement or violated any Applicable Law in connection with the Channel Services or any other Bank Agreement; (b) Customer becomes insolvent, is placed in receivership or is adjudicated bankrupt or Customer becomes subject to any voluntary or involuntary bankruptcy proceeding or any assignment for the benefit of its creditors; (c) Customer's financial condition has become materially impaired in Bank's good faith opinion based on reasonable evidence such that Bank believes Customer is likely to be unable to perform its material obligations to Bank; (d) any person or group acting in concert that is not a controlling stockholder of Customer on the date of this Agreement acquires, directly or indirectly (whether by merger, stock purchase or issuance, recapitalization, reorganization or otherwise), a majority of Customer's outstanding equity interests; or (e) the continued provision of any of the Channel Services in accordance with the terms of this Agreement would, in Bank's good faith opinion, cause Bank to violate Applicable Law or any requirement, policy or directive of any regulatory authority, or would subject us to an unacceptable risk of loss or material security risk.

***Section 12.3. Effect.*** Upon any termination of this Agreement, Customer shall: (a) promptly pay to Bank all sums due or to become due under this Agreement, (b) securely destroy (or return to Bank if requested by Bank) at Customer's expense all Channel Documentation, Security Procedures, and related Implementation Materials, and all copies and

reproductions thereof, whether written or in magnetic media and whether received from Bank or otherwise; and (c) have no further right to make use of the Channel Services.

***Section 12.4. Survival.*** Termination of the Channel Service or this Agreement does not relieve or release Customer's payment obligations for any Channel Service or Service Bank provides before and after the Channel Service or this Agreement is terminated, nor does it release Customer or Bank from any of our respective obligations that arose or became effective prior to such termination. In addition, all provisions of this Agreement relating to the parties' warranties, representations, confidentiality or non-disclosure obligations, proprietary rights, limitation of liability and indemnification shall survive the termination of the Channel Services or this Agreement.

## SECTION 13. FORCE MAJEURE.

Neither party shall be responsible, and neither shall incur any liability to the other, for any failure, error, malfunction or any delay in carrying out any of its obligations under this Agreement directly resulting from causes beyond such party's reasonable control, including without limitation, fire, casualty, lockout, strike, pandemic, epidemic, or disease outbreak, legally mandated quarantine or travel or work restrictions, unavoidable accident, failure of networks, the Internet or telecommunications systems, act of God, act of terrorism, riot, war or the enactment, issuance or operation of any adverse governmental law, ruling, regulation, order or decree, or an emergency that prevents such party from operating normally; provided, however, that Customer shall not be relieved of its responsibility for timely performance of any of its payment obligations to Bank.

## SECTION 14. MISCELLANEOUS.

***Section 14.1. Entire Agreement.*** This Agreement together with the applicable Channel Service Schedule and Channel Services provisions of the Bank Agreements (if any), applicable terms of use of any Mobile Apps (if any) constitutes the complete and exclusive statement of the agreement between the parties with respect to the Channel Services and supersedes any prior or contemporaneous agreements between the parties with respect to such Channel Services. If there is a conflict between this Agreement and a Bank Agreement, the terms of this Agreement shall control to the extent necessary to resolve the conflict. Nothing in this Agreement confers a right or benefit on any person or entity other than Bank and Customer.

***Section 14.2. Account and Services Management***

***Section 14.2.1 Customer Information Review.*** Customer is responsible for monitoring its use of the Services and all activity in its Accounts with Bank. Information regarding transactions with the Services is reported on Customer's periodic Account statement and is available through the Channel Services. Depending upon the Services that Customer uses, Customer will have access to Account and transaction information on a prior day, intraday and/or real time basis. Account and transaction information changes frequently and is subject to updating, verification and correction. Bank assumes no responsibility for Customer's reliance on any Account or Service information reported on an intraday or prior day basis that is subsequently updated, verified or corrected. Customer understands and agrees to: (a) regularly

review the Account and transaction information (including statements) that Bank makes available to Customer; and (b) notify Bank as soon as reasonably possible of any error, unauthorized transaction, discrepancy or other similar matter (each, an "*Error*").

***Section 14.2.2 Error Reporting.*** Customer understands that the nature of certain transactions and Applicable Law relating to certain Services, including those accessible through the Channel Services, require that Customer provide Timely Notice (defined below) of an Error (defined below) in order to preserve or exercise rights against third parties that may have been the beneficiary of such Error. "*Timely Notice*" is defined as notice provided to Bank: (a) on the same Business Day with respect to any Payment Order (including Real Time Payments), (b) the next Business Day for other electronic funds transfers, or (c) within thirty (30) days for any other Instruction, transaction or Service (ninety (90) days in the case of Fees), following the date on which such information is sent by Bank or otherwise made available to Customer. If Customer fails to provide Timely Notice to Bank of any Error, then Customer shall be precluded from asserting such Error against Bank. The Timely Notice requirement does not limit Bank's or Customer's rights to attempt to collect on unauthorized or fraudulent transactions from other banks. Notwithstanding the forgoing, Bank reserves the right, in its sole discretion, to adjust transaction records for good cause after the expiration of the Timely Notice time periods.

***Section 14.3 Amendment.*** This Agreement including any Channel Service Schedule may be modified by a written agreement executed and signed by the parties. Bank may, however, modify this Agreement including any Channel Service Schedule by giving Customer written notice. If Customer or a User uses or accesses the applicable Channel Services after the expiration of thirty (30) days of the giving or posting of such notice (or a later effective date specified in such notice or posting), Customer is bound by this Agreement including Channel Service Schedule as so modified. Notwithstanding the foregoing, if a modification to this Agreement or any Channel Service Schedule is required by or under Applicable Law or by a regulatory authority with jurisdiction over Bank or is, in Bank's sole good faith opinion, necessary to preserve or enhance the security of the Channel Services or update the functionality (including if required by a Processor), Bank may modify this Agreement including any Channel Service Schedule by giving Customer notice of the modification by any means permitted by Applicable Law, and the modification will be effective immediately upon Bank giving such notice.

***Section 14.4. Assignment.*** Customer may not sell, assign or transfer any of its rights or obligations under this Agreement without Bank's prior written consent. Bank may assign its rights and obligations under this Agreement in whole or in part without Customer's consent (a) pursuant to, or in connection with any merger, consolidation or amalgamation involving Bank or its parent company, or the sale or transfer of all or substantially all of Bank's assets or stock, or (b) in connection with the sale or other disposition involving a line of business to which this Agreement relates. Bank will use reasonable efforts to notify Customer of any such assignment. Customer expressly reserves its right to terminate any or all Services in the event of any such transaction.

***Section 14.5. Governing Law; Venue; Waiver of Jury Trial.*** This Agreement and any claims or disputes relating to or arising out of this Agreement or the Channel Services shall exclusively be governed by, and construed in accordance with, the laws of the State of Ohio,

without regard to Ohio's conflict of law principles, and with applicable federal laws and regulations. Customer irrevocably submits to the nonexclusive jurisdiction of the state and federal courts in Ohio and agrees that any legal action or proceeding with respect to this Agreement may be commenced in such courts. EACH PARTY EXPRESSLY, IRREVOCABLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

***Section 14.6. Notices.*** Except as otherwise specifically provided in the Service Terms, Channel Service Schedule, Channel Documentation or the Implementation Materials with respect to a particular Channel Service, notices under this Agreement shall be provided in writing by nationally recognized overnight courier, hand delivery or email. The Bank also reserves the right to provide notice to Customer electronically via email or posting to the Bank's online platform or Access Channel, each of which Customer agrees will be considered "in writing." The address for notices to Customer will be the address the Bank has in its records with respect to this Agreement or the particular Service, as applicable. The address for notices to Bank will be as the Bank specifies to Customer in writing, including in the Implementation Materials. Notices shall be deemed effective: (i) when received, if sent by overnight courier or hand delivery; (ii) three (3) days after sending, if sent by U.S. Mail; or (iii) when sent or posted, if provided via email or posting to the Bank's online platform.

Notwithstanding any terms in this Section to the contrary, any addition, deletion or change to any Services or Service Terms requested by Customer (each, a *"Change Request"*) must be submitted in a form acceptable to the Bank. No Change Request will become operative or effective until the Bank has had an opportunity to review and respond to such Change Request, which the Bank agrees to do within a reasonable period of time.

***Section 14.7. Counterparts.*** The Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute a single instrument.

***Section 14.8. Severability.*** If performance of the Channel Services in accordance with the terms of this Agreement would result in a violation of any Applicable Law to which Bank is subject, then this Agreement shall be deemed amended to the degree necessary to comply with such Applicable Law, and Bank shall incur no liability to Customer as a result of such violation or amendment. If any provision of this Agreement is held to be invalid, illegal or unenforceable, such provision shall be valid, legal and enforceable to the maximum extent permitted by such holding and the validity, legality, or enforceability of the other provisions of this Agreement will not be affected or impaired by such holding.

***Section 14.9. Headings.*** Headings are for reference purposes only and are not part of this Agreement.

***Section 14.10. Waiver.*** No party's failure or delay in exercising any right or remedy under this Agreement will operate as a waiver of such right or remedy, nor shall any waiver by either party of any breach of the other party's obligations under this Agreement operate as a waiver of any prior, current or subsequent breach. No waiver will be effective unless made in writing.

## SECTION 15. AFFILIATES.

***Section 15.1. Joinder.*** By executing this Agreement, Customer (as indicated on the Signature Page and for purposes of this Section the *"Initial Customer"*), each Affiliate of Customer listed below on the Signature Page (if any), and Bank agrees that each such Affiliate shall have all of the rights and obligations of, and shall for all purposes be a party under this Agreement as, "Customer." Additional Affiliates can be added through an addendum to this Agreement in the form required by Bank and executed by Customer, that Affiliate and Bank.

***Section 15.2. Representation.*** Initial Customer represents, warrants and covenants to Bank that (a) Initial Customer has the authority to use the Services and access the Accounts on behalf of each Affiliate as permitted by this Agreement, (b) each entity signing this Agreement as an Affiliate meets the definition of Affiliate and shall continue to meet such definition as long as the entity receives or uses the Services, and (c) the individual signing this Agreement is duly authorized to execute this Agreement on behalf of each Affiliate. Each Affiliate hereby agrees to be bound by the terms of this Agreement for the use of the Services.

***Section 15.3. Role of Initial Customer; Responsibility.*** Each Affiliate agrees that it is responsible for the payment of fees or maintenance of required balances for the Services that it receives from Bank, and for all obligations and liabilities it incurs. Each Affiliate hereby authorizes Initial Customer, and Bank may rely on Initial Customer's authority, to act as agent for such Affiliate in connection with any and all matters relating to the Agreement, including, without limitation, administering the Services and originating transactions (i.e., ACH, wire, other electronic funds transfer, or check), executing Implementation Materials, acceptance and allocation of the payment of interest or earnings credits, terminating the Agreement, collection and negotiation of items for deposit, agreeing to modifications and amendments to the Agreement, adding new Affiliates, and receiving notices under the Agreement (which will be effective against the Affiliates, even if such notices and communications are sent only to Initial Customer); any and all such actions by the Initial Customer shall be binding on the Affiliates. Each Affiliate agrees that it is responsible for the payment of Fees or maintenance of required balances for the Services that it receives from Bank, and for all obligations and liabilities it incurs.

***Section 15.4. Single Channel Access.*** Initial Customer and any Affiliate acknowledge and agree that the Security Procedures and Credentials provided by Bank to the Initial Customer shall be used to use the Services, and that such Security Procedures are commercially reasonable for the Instructions to be provided on behalf of each Affiliate. As such, each Affiliate acknowledges and agrees that (i) Bank may rely on and act on any and all communications and Instructions it receives through Channel Services using the Security Procedures and Credentials assigned to the Initial Customer and Bank's reliance shall not constitute negligence or willful misconduct or bad faith, (ii) each Customer shall be bound by such use of the Services and any Instructions (including funds transfers) and liable for any transactions debiting the Account of the Affiliate, and (iii) Bank shall have no liability or responsibility for notifying any Affiliate with which Initial Customer shares its Security Procedures. Each Affiliate and Initial Customer understands and agrees that use of the Services and any transactions affecting each Affiliate's Accounts may be reflected on the records of Bank as initiated by the Initial Customer.

***Section 15.5. Guarantee.*** Initial Customer unconditionally and irrevocably guarantees to Bank the full and prompt payment and performance by each Affiliate of all obligations they or any of them may incur under this Agreement, now or in the future, including, but not limited to, obligations for Fees and indemnification. Initial Customer further agrees that unless and until the full amount owing to Bank by the Affiliates under this Agreement have been paid in full, that Initial Customer will not exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to Initial Customer against such Affiliate. If any Affiliate's payment applied by Bank to such Affiliate's obligations under this Agreement is set aside, recovered, rescinded, or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency, or reorganization of such Affiliate), then Initial Customer's obligations and liabilities under this Agreement will be enforceable as fully as if such application had never been made. Initial Customer agrees to pay any and all such amounts upon demand by Bank. **Initial Customer acknowledges and agrees that Initial Customer's guarantee is provided for good and valuable consideration, as Bank would not have otherwise permitted Affiliate(s) to use the Services as permitted for and requested by Initial Customer under this Agreement without the foregoing guarantee.**

## SECTION 16. DEFINITIONS.

***"Access Channels"*** means Fifth Third Direct, the Mobile Apps and other websites, portals, or application program interfaces (API), and direct access that Bank makes available to its commercial, business and financial institution customers. Bank's Access Channels do not include portals or other means of access that may be provided by or available through a third party and clearly marked as such.

***"Account" or "Accounts"*** means one or more commercial deposit accounts at Bank that is maintained or controlled by Customer, including accounts held by Customer's Affiliates or other third parties that have granted authorized access to Customer, including through the Channel Services.

***"Affiliate"*** means any entity in which Initial Customer maintains a direct or indirect ownership interest.

***"Agreement"*** includes the Online Channel Access Agreement, the applicable Channel Service Schedule and all Channel Documentation.

***"Applicable Law"*** means all applicable federal and state laws, rules and regulations as in effect from time to time governing or relating to the Agreement or the Services, including, without limitation, the Operating Rules and the rules of any funds transfer system, and the rules of, and regulations administered by, the Office of Foreign Assets Control of the U.S. Treasury Department.

***"Bank Agreements"*** means each of the separate written agreements (including, if applicable, a Master Treasury Management Agreement ""*MTMA*"), Account documentation, notes, related agreements and other documents and instruments in effect between Customer and Bank and which govern the applicable Service. Customer may be required to enter into an

agreement with a third-party service provider that enables Bank to provide Channel Services to Customer.

***"Business Day"*** means any other day other than a Saturday, Sunday, holiday or other day on which the Bank is required or permitted to be closed.

***"Channel Administrator"*** means each individual appointed by Customer as the Customer administrator for Channel Services on the Implementation Materials or other written Instruction.

***"Channel Documentation"*** means the online or text manual and user guides Bank provides to Customer that contain technical specifications, Instructions and guides for using a Channel Service.

***"Channel Service Schedule"*** means a schedule or addendum executed by Bank and Customer that expressly refers to or incorporates this Agreement (including the applicable Bank Agreements) and sets forth the features, functionality and other aspects of the Channel Service available to Customer for a particular Service.

***"Channel Services"*** means, collectively, the Access Channels and the services, functionality, content and features available for use with or through the Access Channels as more particularly set forth in this Agreement and the applicable Channel Service Schedule or Bank Agreement (but not including the Services themselves).

***"Credentials"*** means the username, personal identification numbers, identification codes, passwords and other identifying and authentication inputs, security token or authentication device, equipment or software, that the Channel Administrator and Users use or apply in order to access the Channel Services.

***"Customer Measures"*** means reasonable procedures, policies, internal controls and measures including reasonably available software design to ensure the secure and authorized use of the Services and Channel Services including, as appropriate for Customer and its use of Services: (a) comprehensive legal compliance, business continuity and data protection programs; (b) security and data protection software and technology, including firewalls; (c) regularly monitoring the Accounts and use of the Services; (d) control of user Credentials; (e) ongoing training and education to management, employees, and Vendors on the secure use of the Services and various forms of threats to security including email scams, phishing and similar attacks; and (f) regular auditing of Account activity and assessment (at least annually) the security of its information technology infrastructure and Customer Measures.

***"Cutoff Time"*** means the time on any Business Day when Bank will no longer accept Instructions or process transactions (including Payment Orders) for that Business day and any such Instructions received after such time, if accepted, and transactions processed on that day will be processed as of the next Business Day.

***"Implementation Materials"*** means any documents that facilitate the use of a service, specifications, set-up and sign-up forms provided by Bank, and those completed and submitted by Customer, including electronically.

***"Instruction"*** means a Payment Order or other instruction for a wire transfer, electronic funds transfer, ACH Entry (as defined in the Operating Rules), file, batch release or other message, instruction or direction provided using Customer's Security Procedures, or otherwise provided by or on behalf of Customer to Bank to perform a Service or take action on behalf of Customer or its Accounts.

***"Losses"*** means any and all claims, actions, demands, losses, damages, judgments, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) and all costs of settlement of claims.

***"Mobile Apps"*** means the applications or "apps" Bank makes available and authorize for downloading by Customer and Users on Mobile Devices.

***"Operating Rules"*** means the Operating Rules and Operating Guidelines of the National Automated Clearinghouse Association, the Electronic Check Clearing House Organization Rules, and the rules of any other national or regional clearinghouse, payment card association (e.g., MasterCard Incorporated), or payment network (e.g., SWIFT, ECCHO, The Clearing House Payments Company L.L.C., Fedwire Funds Service) in effect from time to time and in which Bank participates and uses to provide Services.

***"Payment Order"*** has the meaning ascribed thereto in Article 4A of the UCC, and shall include, but not be limited to, Instructions given for the use of any Service for the origination, processing and payment of electronic funds transfers, including any wire transfers, ACH Entries, and any internal funds transfers between Accounts.

***"Processors"*** means any third-party processors engaged by Bank to provide any part of the Services.

***"Security Procedures"*** means the Credentials, call back protocols, and other systems or procedures provided by Bank, its Processors or any payment network for authenticating Instructions, transactions and the use of a Channel Service.

***"Services"*** has the meaning set forth in the applicable Bank Agreement.

***"Service Terms"*** means the terms and conditions for the Services provided by Bank to Customer under this Agreement, including any Implementation Materials or otherwise incorporated herein.

***"UCC" or "Uniform Commercial Code"*** means the Uniform Commercial Code, as enacted in the State of Ohio.

***"User Rights"*** means the entitlements and other rights provisioned by the Channel Administrator or Bank to a User, subject to any restrictions imposed by the Channel

Administrator or Bank (including rights to certain types of Channel Services, dollar amount, Account and transaction type limitations, Channel Services and approval processes) with respect to some, all or a defined set of the Channel Services.

***"Users"*** means personnel or sets or types of personnel including the Channel Administrator, whose User Rights have been established in accordance with this Agreement.

***"Vendor"*** means any third-party service provider used by Customer in connection with the Services or to whom Customer give access to any Service, including through an Access Channel or the Channel Services.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

**CUSTOMER NAME:**

Hegira Health Inc.

Tax ID: [redacted]

By: [signature]

Print Name: Robert Davidge

Print Title: CFO

**FIFTH THIRD BANK, NA:**

By: Cussandra McAfee

Print Name: Cussandra McAfee

Print Title: Client Advisor I, Officer

Date: 01/20/2022

**NOTE: If required by resolution, second officer of Customer must sign below:**

By: ______

Print Name: ______

Print Title: ______

**Signing as a duly authorized officer or agent of each of the Affiliates listed below**

By: ______

Print Name: ______

Print Title: ______

This Agreement includes the following Affiliates:

| **Affiliate Name:** | **Tax ID No.:** |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



4824-8882-8135.4